IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROCHE DIABETES CARE, INC.,    )
    )
    Plaintiff,    )
    )
    v.    )    C.A. No. 20-825 (MN)
    )
INSULET CORPORATION,    )
    )
    Defendants.    )

**MEMORANDUM ORDER**

At Wilmington this 16th day of June 2021:

IT IS HEREBY ORDERED that the disputed claim terms of U.S. Patent No. 7,931,613

("the '613 Patent") are construed as follows:

1. "to receive communications from the administration device relating to medical fluid amounts delivered from the administration device" and "communicating information relating to amounts of the medical fluid delivered from the administration device, from the administration device to the communication terminal," shall have their plain and ordinary meaning (cl. 1, 9);

2. "to store in the memory historical medical fluid administration data and substance level measurement values over time based on the communications received from the administration device" shall have its plain and ordinary meaning (cl. 1);

3. "determining a medical fluid dosage to be administered to the body by an administration device remote from the communication terminal, the medical fluid dosage determined on the basis of the communicated substance level" shall have its plain and ordinary meaning (cl. 9);

4. "a computer"/"the computer" shall have its plain and ordinary meaning (cl. 15);

5. "a measuring device separate and distinct from the computer" means "a measuring device physically separate and distinct from the computer" (cl. 15)

6.    "wherein the measuring device is an independent module that is removable from the communication terminal" and "the measuring device may be repeatedly connected and disconnected to the communication terminal via the first and second ports" shall have their plain and ordinary meaning (cl. 3); and

7.    "wherein the software is configured to provide a graphic of medical fluid administration data as a function of time" means "the software is configured to provide a graphical representation of medical fluid administration data as a function of time and not simply text" (cl. 15).

The parties briefed the issues, (*see* D.I. 67), and submitted a Joint Claim Construction Chart containing intrinsic evidence, (*see* D.I. 53).   The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument, (*see* D.I. 80), and applied the following legal standards in reaching its decision.

## I.    LEGAL STANDARDS

### A.    Claim Construction

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015).  "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted).   Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314.  "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent."  *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.  Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318.  Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.*  Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.  Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II.      THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the '613 Patent were announced from the bench at the conclusion of the hearing as follows:

> . . . Thank you for the arguments today. They were very helpful. At issue we have one patent and seven disputed claim terms.
>
> I am prepared to rule each of the disputes. I will not be issuing a written opinion, but I will issue an order stating my rulings. I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed the patent in dispute. I have reviewed the portions of the prosecution history, the definitions, and the prior art references included in the joint appendix. There was full briefing on each of the disputed terms. And there has been argument here today. All of that has been carefully considered.
>
> As to my rulings. I am not going to read into the record my understanding of claim construction law generally. I have a legal standard section that I have included in earlier opinions, including

4

somewhat recently in *Best Medical International v. Varian Medical Systems, Inc.*, C.A. No. 18-1599. I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.

Now the disputed terms.

The first term comprises two related phrases: "to receive communications from the administration device relating to medical fluid amounts delivered from the administration device" and "communicating information relating to amounts of the medical fluid delivered from the administration device, from the administration device to the communication terminal," which are in claims 1 and 9, respectively. Plaintiff asserts that these phrases need no construction or, in the alternative, that "relating to" means "about or connected to." Defendant argues that the phrases should be construed as "the administration device communicates to the processor the medical fluid amounts administered by the administration device" and "the administration device communicates to the communication terminal the medical fluid amounts administered by the administration device."

The crux of the dispute is whether Roche surrendered any meaning other the one proposed by Defendant and/or whether the "relating to" language means the claim covers things related to medical fluid amounts and not just the medical fluid amount. Here, I agree with Plaintiff and will give the term its plain and ordinary meaning.

This is supported by the specification where, for example at column 3, lines 47–56, it discloses that information about the conveying means is related to the amount of fluid. Similarly, at column 8, lines 52–56, in describing Figure 1, the patent refers to the administration device transmitting force and position of the piston data, which allows the communication device to determine the fluid amounts. This force and position data relate to the amount.

Defendant agrees that the specification discloses other information relating to the amount of fluid. But Defendant argues that there was a disclaimer during prosecution.[1] "[F]or prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be both

---

1        (*See* D.I. 67 at 15).

clear and unmistakable."[2] Defendant has not met this high standard.

During prosecution, the patentee added language, including the "relating to" language at issue, to overcome the Examiner's denial of the claims as obvious in light of two pieces of prior art.[3] The patentee described one of those, Feingold, by asserting that Feingold disclosed the state of the reservoir, condition of the battery and flow characteristics. Patentee then made the statement that Defendant claims constitutes disclaimer,[4] i.e., "Feingold does not teach communication of fluid amounts administered from the implantable unit," which is immediately followed by a recitation of the claim language at issue, "Feingold does not teach 'wherein the administration device communicates information relating to medical fluid amounts.'" I do not see this as a clear and unmistakable disclaimer, especially given that it would mean the patentee disclaimed the "relating to" language in the very same filing which added that language. And as the Federal Circuit has counseled, "[w]here the alleged disavowal is ambiguous, or even 'amenable to multiple reasonable interpretations,' . . . we have declined to find prosecution disclaimer."[5]

Therefore, I cannot accept Defendant's proposal and will give the term its plain and ordinary meaning.

The second term is "to store in the memory historical medical fluid administration data and substance level measurement values over time based on the communications received from the administration device" in claim 1. Plaintiff asserts that this term needs no construction or, in the alternative, that it should be construed as "adapted to store in the memory historical medical fluid administration data and substance level measurement values over time based on the communications received from the administration device." Defendant contends that the term should be construed as "the memory stores both the historical medical fluid amounts administered and the substance level measurement values over time based on communications received from the administration device."

---

2    *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (quoting *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003)).

3    (*See* D.I. 68, Ex. K at 2, 4, 11).
4    (*See id.* at 11).

5    *Avid Tech*, 812 F.3d at 1045 (citing *Cordis Corp. v. Medtronic AVE, Inc.,* 339 F.3d 1352, 1359 (Fed.Cir.2003), *Omega Eng'g*, 334 F.3d at 1325–26).

There are three disputes as to this term. First, whether the memory must actually store the relevant information, or the processor must simply be "adapted to" or capable of storing it. Second, whether the "medical fluid administration data" is limited to "medical fluid amounts administered" based on prosecution disclaimer. And third, whether the storage of fluid data and substance level measurement values must be based on "communications received from the administration device." On each of these issues, I agree with Plaintiff and will therefore give the term its plain and ordinary meaning.

As to whether the memory must actually store the information, I find that the claim does not include that requirement. The claim language states that "the processor is . . . adapted to . . . store in the memory" particular information.[6] This is consistent with the rest of claim 1, which describes components of a system rather than functions performed by that system. The specification supports that meaning as well. It states that "[i]t is further *possible to store* blood-sugar measurement values over the time," not that such values *are* stored.[7] And although Defendant argues that the prosecution history supports its interpretation, I don't agree.[8] In the April 24, 2009 filing, the patentee changed the words "the memory stores" to "a memory in communication with the processor configured for storing."[9] Therefore, the patentee clearly considered and chose not to use the construction now proposed by Defendant.

And then later, after additional word changes, in the August 17, 2010 Amendment, the patentee changed "configured for storing" to "to store" the infinitive form of the verb which then matched the form of *execute* in "adapted to execute." I read that to mean that the adapted language applies to both "to execute" and "to store."

As to whether "medical fluid administration data" is limited to "medical fluid amounts administered," I agree with Plaintiff that it is not. As I have already explained, I do not believe there was a clear and unmistakable prosecution disclaimer that supports Defendant's proposed limitation, so I will not read it in here.

---

[6]     (Col. 12 ll. 52–56).

[7]     (Col. 10 ll. 8–10 (emphasis added)).

[8]     (*See* D.I. 67 at 32).

[9]     (*See* D.I. 68, Ex. T at 2).

As to whether "based on the communications received from the administration device" applies to storing both types of data," I find that the claim requires the processor to be capable of storing both types of information based on communications received from the administration device. It is the storing of the information that must be based on the communications from the administration device. This is consistent with the specification, which describes one embodiment in which the "blood-sugar measuring means is . . . integrated into the housing of the communications device."[10] That embodiment suggests that the "substance level measurement values over time" that are stored are based on the sensor already in the communications terminal, rather than based on communications from the administration device.

The third term is "determining a medical fluid dosage to be administered to the body by an administration device remote from the communication terminal, the medical fluid dosage determined on the basis of the communicated substance level" in claim 9.[11] Plaintiff again contends that no construction is necessary. Defendant argues that the term should be construed as "determining by the processor a dosage of the medical fluid to be administered to the body by the administration device based on the communicated substance level."

The crux of the dispute is whether claim 9 requires the dosage amount to be determined by the processor. Here, I agree with Plaintiff and will give the term its plain and ordinary meaning.

The claims show that the patentee clearly indicated which steps must be performed by a processor.[12] In claim 15, the patentee explicitly stated that "the processor is configured to determine a medical fluid dosage." The language of claim 9, however, does not require a processor to determine the fluid dosage.[13] Defendant's proposal ignores this difference in the claim language.

The specification also supports the plain and ordinary meaning. It notes that, when necessary, the user can compensate for deviations

---

10      (Col. 10 ll. 19–20).

11      (D.I. 80 at 39:7–18, 40:12–23).

12      (Col. 14 ll. 14–15).

13      (*See* col. 13 ll. 26–27).

"by means of an extra dose supply,"[14] indicating that the user can determine when to administer a dose and how large it should be. The specification also clarifies that the user can "influence[] or operate[]" controls for the fluid conveying mechanism, again suggesting that the user can choose to administer an extra dose.[15]

To the extent that Defendant argues that there was prosecution disclaimer regarding this term, I do not find that the statements regarding the Mann reference constitute a clear and unmistakable disavowal. There were many reasons given to distinguish Mann, and reading the patentee's description of Mann in context,[16] it does not seem that the discussion was directed to the present issue of who or what can determine an appropriate dosage of medical fluid.

Therefore, as I said, I will give this term its plain and ordinary meaning.

I am going to address the fifth term in the briefing before the fourth term. The fifth term is "a measuring device separate and distinct from the computer" in claim 15. Plaintiff contends that no construction is necessary or, in the alternative, that the term should be construed as "a measuring device is apart and distinguishable from the computer." Defendant argues that the term should be construed as "the measuring device is not connected to the computer until the transducer physically mates with the communication port."

The crux of the dispute is whether the measuring device must be totally unconnected to the computer until the transducer is mated to the communication port. I am not going to adopt Defendant's proposed language, but I think it is appropriate to clarify the meaning of the claim language, so I am going to construe the term as "a measuring device physically separate and distinct from the computer."

The claim language suggests that the measuring device is physically separated from the computer. The claim specifies that the measuring device is "separate and distinct" from the computer and that it contains a transducer that must "physically mate with [the communication port of the computer] to be placed in

---

[14]    (Col. 9 ll. 63–66; *see also* col. 10 ll. 12–17 (referring to user comparing administration history and blood-sugar measurement values "possibly also for future administrations").

[15]    (Col. 5 ll. 19–23).

[16]    (*See* D.I. 68, Ex. N at 11–12).

communication with each other."[17] This suggests that the measuring device is not a built-in component of the computer and is physically distinct from it.

The specification confirms this construction. It states that the measuring device is a "module [that] can be integrated and connected to a defined interface of a computer. Accordingly, not only can it be supplied by computer manufacturers, but also by independent manufacturers at a later time."[18] This shows that the measuring device is not a component that is built into the computer, and that it can be removed and replaced later on, meaning it is separable and physically distinct. Every example given in the specification and cited by Plaintiff describes the measuring device as a "plug-in module"[19] or a "module that is inserted into a prepared slot."[20] Because the claim does not specify plugging in or insertion, I will not read in that limitation, but I find that these examples show that the measuring device is physically separate and distinct.

Finally, the prosecution history demonstrates that the patentee understood the measuring device to be *physically* separate and distinct. The patentee distinguished the "separate and distinct" measuring device sensor described in the Feingold reference because the latter was an "integral component[] of the external controller."[21] The patentee similarly distinguished the Purvis reference which included "a built-in sensor unit."[22] And in distinguishing both references, the patentee explained that "providing the measuring device as a separate and distinct component accommodates, for example, flexibility in the selection of the particular measuring device to employ, as well as convenient replacement of the measuring device, such as in the event a more sophisticated measuring device becomes available or the measuring device is damaged."[23] This shows that the patentee understood the

---

17      (Col. 14 ll. 1–7).

18      (Col. 1 ll. 62–67).

19      (Col. 2 ll. 19–20, 23).

20      (Col. 10 ll. 45–46).

21      (D.I. 68, Ex. K at 13).

22      (D.I. 68, Ex. P at 13).

23      (D.I. 68, Ex. K at 13; D.I. 68, Ex. P at 13).

measuring device to be a removable, replaceable component rather than a built-in one, which means the device must be physically separate and distinct.

Thus, I am going to construe this term as "a measuring device physically separate and distinct from the computer." I am not going to address the issue raised today as to whether that means fully or partially separate and distinct because it was not raised or briefed and I am not convinced that it is a claim construction issue rather than an infringement issue as to whether a POSA would understand a particular configuration to meet the term as construed. If it turns out to be a claim construction issue that is still relevant, the parties may raise it in connection with summary judgment and remind me that I said that so that I don't wonder why it's coming up at a later time.

The next term is "a computer" or "the computer" in claim 15. Plaintiff suggests that the term requires no construction or that, in the alternative, the term should be construed as "an electronic device or unit that can retrieve and process data." Defendant asserts that the term should be construed as "a common computer that is not specifically adapted to control the administration of medical fluids."

The dispute centers on whether the "computer" of claim 15 is limited to an ordinary consumer computer such as a laptop or desktop PC rather than a device specifically adapted to use in the claimed system. I agree with Plaintiff and will give the term its ordinary meaning.

The patent uses the word "computer" repeatedly, often but not always referring to a computer as a conventional or personal computer.[24] For example, at column 2, lines 35–37, the specification states that "the invention may be used with a computer of a device used for self-administration of a fluid product or with a computer used in combination therewith." This suggest that the term "computer" may be one that is specifically adapted for use with a particular device.

Defendant largely relies on the prosecution history to support its construction. Unfortunately, as we discussed during the hearing, the

---

24  (*See* col. 1 ll. 61–62 ("a conventional computer"), col. 2 l. 5 ("conventional computers"), col. 2 l. 25 ("a personal computer"), col. 12 l. 3 ("personal computer"). *See also* col. 2 ll. 11–12 ("a computer generally already available"), col. 2 l. 30 ("computer surroundings [a user] is already familiar with"), col. 6 ll. 32–34 ("usual well-known types of computers such as personal computers, notebooks, and pocket-sized computers"), col. 2 ll. 20–21 ("a standard slot of a computer."), col. 11 l. 67 ("a standard computer")).

prosecution is not a model of clarity. The Examiner seems to distinguish between the claimed "computer" being a personal computer such as a "laptop, desktop computer" and a communication terminal such as a "hand held or palm type."[25] The Examiner then gave alternative grounds for rejection based on each interpretation. [26] The patentee appears only to have responded to the ground based on the computer being a personal computer rather than the "communication terminal."[27] Although one interpretation of patentee's argument is consistent with Defendant's argument here – i.e., that the claims were directed to a standard computer like a desktop, I cannot find it to be a clear and unmistakable disclaimer given the confusing language offered by the Examiner. Indeed, the hand held and palm type devices mentioned by the Examiner are used as examples of computers in the specification, referring to an embodiment in which the communication terminal is a hand held or palm sized computer."[28]

Therefore, I will adopt Plaintiff's construction and give the term its plain and ordinary meaning.

The sixth term is two different terms in claim 3: "wherein the measuring device is an independent module that is removable from the communication terminal" and "the measuring device may be repeatedly connected and disconnected to the communication terminal via the first and second ports." Plaintiff suggests that no construction is needed. Defendant argues that the terms should be construed as "the measuring device is an independent module that is capable of being repeatedly removed and reinserted into the communication terminal via the first and second ports."

The dispute as to this term is twofold. First, whether *connecting* the measuring device to the communication terminal means *inserting* it into the terminal. And second, whether the measuring device must be capable of repeated removal from the communication terminal. I agree with Plaintiff as to both of these issues, and I will give the term its plain and ordinary meaning.

The claim language is broader than the "reinserted" language proposed by Defendant. The claim itself says that the "second port

---

[25]     (D.I. 68, Ex. O at 2).

[26]     (*Id.* at 2–3).

[27]     (D.I. 68, Ex. P at 5, 9).

[28]     (Col. 6 ll. 34, 54–56).

[is] configured to mate with the first port"[29] and that the measuring device and communication terminal "may be repeatedly connected and disconnected . . . via the first and second ports."[30] Plainly, this encompasses other types of coupling beyond insertion. The specification also notes that the measuring device module "can be integrated *and connected to* a defined interface of a computer," which is similarly broad in scope.[31] And even assuming Defendant is correct that the only concrete examples of this connection given in the specification refer to inserting a port into a computer,[32] the Federal Circuit has repeatedly cautioned against reading limitations from embodiments in the specification into the claims in cases such as *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) and *Superguide*.[33] I will heed that caution and will not read in Defendant's proposed limitation.

As to whether the measuring device module must be repeatedly removable, I find that nothing in the intrinsic evidence suggests that requirement. The claim itself does not say "repeatedly" removable, whereas it does specify that the measuring device "may be *repeatedly* connected and disconnected to the communication terminal."[34] And contrary to Defendant's assertion, "removing" a module and "disconnecting" it are not necessarily the same. The specification states only that the measuring device may be "a detachable module,"[35] which also does not imply repeated detachment.

Therefore, I am going to give this term its plain and ordinary meaning.

The seventh and final term is "wherein the software is configured to provide a graphic of medical fluid administration data as a function of time" in claim 15. Plaintiff contends that no construction is necessary. Defendant asserts that the term should be construed as

---

29    (Col. 13 l. 1).

30    (Col. 13 ll. 2–3).

31    (Col. 1 ll. 64–65).

32    (*See* D.I. 67 at 69–68).

33    *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

34    (Col. 13 ll. 2–3).

35    (Col. 10 ll. 63–64).

13

"the software is configured to provide a graphical representation of the medical fluid amount administered as a function of time."

In addition to the same prosecution disclaimer issue from term 1, the dispute also centers on whether the "graphic" provided must be a pictorial or symbolic representation, or whether it may include plain text. Here, I agree with Defendant and will construe the term to mean "the software is configured to provide a graphical representation of medical fluid administration data as a function of time and not simply text."

Plaintiff argues that the specification uses the term "graphic" in a broad sense, which encompasses any display generated by a computer. That is not the case. The display is referred to as the "communications terminal *visual display*" in the same sentence which refers to a "graphical warning symbol."[36] Further, the specification states that the claimed device can represent the amount of medical fluid administered over time, and that "[s]uch a representation is preferably a graphic representation."[37] Adopting the all-encompassing meaning of "graphic" proposed by Plaintiff would render this preference meaningless. Moreover, the specification distinguishes programs primarily directed towards "graphic[s]" from those directed at "text and/or spreadsheet[s]"[38] and repeatedly uses the word "graphic" to refer to symbols, such as a "graphical warning symbol"[39] and the "graphic symbol[s]" associated with different functions of the device.[40] This suggests that the patentee understood "graphic" to be pictorial or symbolic, rather than simply plain text.

Although the specification does, on one occasion, refer to the display as a "graphic display,"[41] that language is not inconsistent with Defendant's proposed construction. The specification goes on to describe how the "graphic display" can show information in the

---

[36]    (Col. 4, ll. 26–27).

[37]    (Col. 3, ll. 56–57).

[38]    (Col. 2, l. 18).

[39]    (Col. 4, l. 27).

[40]    (Col. 11, ll. 30–31).

[41]    (Col. 11 l. 6).

form of a bar chart.[42] Therefore, the display is capable of displaying the pictures or designs that fall under Defendant's definition of "graphic."

Finally, while Plaintiff cites to extrinsic evidence in support of its proposal, the dictionary definitions cited actually support Defendant's construction. The two dictionary definitions provided by Plaintiff define *graphic* as "[a] picture, design, or visual display of data produced by a computer program"[43] and "[a] computer generated image."[44] Both include references to pictures or images.

As to whether the "medical fluid administration data" is limited to "medical fluid amounts administered," I have already explained that I do not agree with Defendant that there was a disclaimer, and I will not adopt that limitation for this term.

Thus, I will construe the term as "the software is configured to provide a graphical representation of medical fluid administration data as a function of time."


The Honorable Maryellen Noreika
United States District Judge

---

[42]    (Col. 11 ll. 8–11).

[43]    *Graphic*, ENCARTA WORLD ENGLISH DICTIONARY (1999).

[44]    *Graphic*, WEBSTER'S UNIVERSAL COLLEGE DICTIONARY (1997).